IN THE SUPREME COURT OF TEXAS
 
════════════
No. 
05-1076
════════════
 
Exxon Corporation and Exxon 
Texas, Inc., Petitioners,
 
v.
 
Emerald Oil & Gas Company, 
L.C. and Laurie T. Miesch, et al., Respondents
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the 
Thirteenth District of Texas
════════════════════════════════════════════════════
 
 
Argued February 13, 
2007
Rehearing Granted November 20, 
2009
            
Justice Wainwright delivered the opinion of the 
Court.                                       

Justice 
Guzman and Justice Lehrmann did not participate in 
the decision.    
            
After issuing our opinion, we granted the parties’ motions for rehearing 
on November 20, 2009 and obtained further briefing from the parties. Without 
further oral argument, we withdraw our opinion of March 27, 2009 and substitute 
the following opinion.
            
In this oil and gas dispute, royalty owners and an oil and gas lessee 
allege that the previous lessee failed to fully develop oil and gas tracts near 
Refugio, Texas and sabotaged the wells before abandoning the lease. The lessee’s 
claims at issue in this appeal are for negligent misrepresentation, fraud, and 
tortious interference with business opportunity. The 
royalty owners’ claims are for statutory and common law waste, breach of 
regulatory duty to plug wells properly, negligence, negligence per se, negligent 
misrepresentation, tortious interference with economic 
opportunity, breach of lease, and fraud. The trial court granted summary 
judgment on lessee’s claims not subject to this appeal and directed a verdict 
against the lessee on its remaining claims and against the royalty owners on 
their claims for statutory waste, negligence, negligence per se, tortious interference, fraud, and negligent 
misrepresentation. The remaining royalty owner claims for statutory and common 
law waste, and breach of contract went to verdict. The 
jury found in favor of the royalty owners. The court of appeals reversed the 
directed verdict and affirmed the jury verdict. 180 S.W.3d 
299. We reverse and remand to the court of appeals. Today, we also issue 
our opinion on rehearing in the companion case of Exxon Corp. v. Emerald Oil 
& Gas Co., ___ S.W.3d ___ (Tex. 2010) (reh’g 
op.).[1]
I. FACTUAL AND PROCEDURAL 
BACKGROUND
            
The royalty owners consist of three families—the Miesches, the O’Connors, and the 
Dunns (collectively the Miesches).[2] They owned mineral interests on several 
thousand acres of land (the O’Connor Field or Field) in Refugio, Texas. In the 
1950s, Humble Oil and Refining Company, a predecessor of Exxon Corporation and 
Exxon Texas, Inc. (collectively Exxon), began acquiring mineral leases from the 
royalty owners. Exxon derived its interests from four separate but similar 
mineral leases with the Miesches. The leases 
(collectively the Lease or the O’Connor Lease) included an atypical fifty 
percent royalty obligation and a stringent disclosure clause. During the term of 
the Lease, Exxon drilled 121 wells and produced at least 15 million barrels of 
oil and more than 65 billion cubic feet of gas, resulting in the payment of more 
than $43 million in royalties to the Miesches. In the 
early 1970s and later in the next decade, Exxon attempted to renegotiate a lower 
royalty because profitability of the operations was declining. As early as 1987, 
the royalty owners requested that Exxon provide them information and 
documentation to support Exxon’s position that the field was being depleted and 
was no longer profitable at the fifty percent royalty. By 1989, Exxon had begun 
plugging some of the thirty-four wells remaining in operation. The Miesches sent a letter, dated August 30, 1990, advising 
Exxon “that in the event you [Exxon] plug and abandon any wells [in the O’Connor 
Field] which are producing or capable of producing minerals in paying quantities 
to [the royalty owners], Exxon will be sued under the terms of the lease and the 
common law, both for present breach of contract and anticipatory damages . . . 
.”
            
Walker and McBroom, Inc., a potential operator for the Miesches whom they engaged to evaluate the amount of 
reserves remaining in the O’Connor Field, advised them by letter of September 4, 
1990, that “Exxon has exhausted any value of the field to them, and created 
substantial environmental hazards” and suggested that the royalty owners pursue 
Exxon’s geologic information of the Field to aid in its future development, 
“particularly if oil and gas prices substantially rise in the 
future.”
            
On September 12, 1990, the royalty owners demanded by letter that Exxon 
deliver all data and documents pertaining to the subject wells, “includ[ing] drilling, production, 
completion and re[-]completion data, well bore production or completion 
schematics or diagrams and flow line maps and surface facility diagrams or 
schematics.” In the same letter, the royalty owners warned that “plugging and 
abandonment of the [six] referenced wells would commit waste and would be 
contrary to public policy and laws” and that the letter “shall also be 
considered as formal demand not to plug the above referenced six wells, as such 
would cause us irreparable harm and commit waste.” The royalty owners further 
informed Exxon that they had “located a group of oil and gas companies that are 
willing to accept the plugging obligation” and assignment of the O’Connor 
Lease.
            
Initially, the royalty owners asserted that Exxon refused to provide any 
information, claiming that the information was proprietary. Later, Exxon claimed 
the information was too difficult to locate and retrieve. Then, Exxon agreed to 
provide the royalty owners a data room containing the requested information 
subject to a confidentiality agreement. The data room included a large quantity 
of information, but apparently did not contain the well logs for the plugged 
wells and did not contain Exxon’s opinions and analysis interpreting the 
data.
            
Exxon ultimately concluded that it could no longer profitably afford the 
O’Connor Lease unless the royalty owners agreed to reduce the royalty obligation 
or assign the leases to third parties. When negotiations to 
lower the royalty obligation failed, Exxon continued plugging and abandoning the 
wells. As required by law, after Exxon plugged each of the wells, it 
filed a plugging report with the Texas Railroad Commission, the department that 
regulates oil and gas production. 16 Tex. Admin. Code § 
3.14(b)(1) (R.R. Comm’n of 
Tex., Plugging).[3] By letter dated August 16, 1991, Exxon 
notified the royalty owners that it had completed its plugging 
operations.
            
In 1993, after the Lease terminated, the royalty owners entered into a 
lease agreement with Pace West Production, Ltd. (Pace or Pace West), later known 
as Emerald Oil & Gas Company, L.C. (Emerald)[4], for approximately one-third of the 
acreage in the O’Connor Lease. In deciding whether to lease the land, Emerald 
reviewed Exxon’s public filings for the Field, including the oil well plugging 
reports (W-3 forms) that Exxon filed with the Texas Railroad Commission. The W-3 
filings seemed to indicate that Exxon properly plugged the wells. However, 
Emerald encountered problems from the beginning of its attempts to re-enter the 
plugged wells, including wellbores plugged with improperly cut casing[5] and other “junk” in the wells, and plugs 
in locations other than those listed on the reports. The term “junk” is a term 
of art used in the oil and gas industry to refer to non-drillable material such 
as steel or iron, in a wellbore. Tarrant County Control 
& Imp. Dist. No. One v. Fullwood, 963 S.W.2d 60, 66 (Tex. 1998) (per curiam); see 16 Tex. Admin. Code 
§ 3.14(d)(10) (R.R. Comm’n of Tex., Plugging) (prohibiting, with exceptions, the 
placement of non-drillable material or junk in the wellbore during plugging 
operations). Rock Thomas, principal in Re-Entry People, the company hired 
by Emerald Oil & Gas to re-enter some of the plugged wells on the Lease, 
explained that “junk” is “something in [the wellbore] that you don’t know what 
it is.” Testimony at trial indicated that nuts, bolts, fiberglass pipe, tubing, 
packers, environmental contaminants and other items were placed in plugged wells 
in the O’Connor Field.
            
Emerald sent the royalty owners a written status report on June 8, 1994, 
explaining that it “encountered junk in [the] hole” in one well, that Exxon had 
cut the casing in several wells, and that cut and shifted casing had halted 
re-entry in at least one well. Royalty owners alleged the cut casing in wells in 
the O’Connor Field caused problems, including increasing costs to re-enter 
wells, making it impossible to re-enter some wells, and substantially damaging 
their interests. In January 1995, Emerald obtained Exxon’s internal well records 
on the O’Connor Lease from Quintana, Exxon’s partner on the adjoining tract, 
also leased by Exxon. Exxon’s internal records allegedly differed substantially 
from the Railroad Commission filings regarding its plugging of the wells in the 
O’Connor Lease. On January 24, 1995, Emerald met with the royalty owners and 
explained the extent of the alleged Field-wide damage to the wells due to 
Exxon’s plugging techniques.
            
Concluding that Exxon intentionally sabotaged the field, Emerald sued 
Exxon in July 1996, and amended the pleading in 1998, claiming breach of 
regulatory duty to plug wells properly, breach of duty to avoid committing waste 
of natural resources, negligence per se in violating several sections of the 
Natural Resources Code and Railroad Commission Regulations, tortious interference with economic opportunity, negligent 
misrepresentation, and fraud. The fraud claim was predicated on false 
representations in public filings with the Railroad Commission that the wells 
were properly plugged.
            
The royalty owners intervened in the lawsuit in two separate groups in 
August and September of 1996, and alleged statutory and common law waste, tortious interference with economic opportunity, breach of 
regulatory duty to plug wells properly, fraud, and environmental claims, and 
sought various measures of actual damages, exemplary damages, and attorney’s 
fees. In October 1999, the royalty owners amended their petitions, adding claims 
for breach of contract for Exxon’s alleged failure to develop the leasehold, 
negligence, negligence per se, and negligent 
misrepresentation.
            
Reasoning that Exxon owed no duty to future lessees such as Emerald, the 
trial court granted in part Exxon’s motion for summary judgment on Emerald’s 
claims for breach of regulatory duty to plug wells properly, breach of common 
law and regulatory duties to avoid committing waste, and negligence per se. The 
court severed the partial summary judgment, and Emerald appealed. The court of 
appeals reversed and remanded the claims to the trial court. See Emerald Oil 
& Gas, L.C. v. Exxon Corp., 228 S.W.3d 166 (Tex. App.—Corpus 
Christi-Edinburg 2005, pet. granted). Exxon appealed that judgment to this Court 
in cause number 05-0729, and we issue the opinion on rehearing in the companion 
case today. Exxon Corp. v. Emerald Oil & Gas Co., 
___ S.W.3d ___ (Tex. 2010) (reh’g 
op.).
            
The case proceeded to jury trial on Emerald’s three common law claims 
(fraud, negligent misrepresentation and tortious 
interference with economic opportunity) and on all of the Miesches’ claims, but the royalty owners abandoned their 
environmental claims before verdict. The trial court granted a directed verdict 
in Exxon’s favor on Emerald’s three remaining claims and on all of the royalty 
owners’ claims except common law and statutory waste and breach of lease. The 
jury found in favor of the royalty owners on the claims against Exxon for waste 
and breach of lease, awarding $5 million in actual damages for waste, $10 
million in punitive damages for acting with malice in conduct causing injury to 
the royalty owners, and $3.6 million in damages for breach of lease. The trial 
court rendered judgment in accordance with the verdict. All parties appealed. 
The court of appeals affirmed the judgment in favor of the royalty owners and 
did not address the Miesches’ claims that were 
dismissed on directed verdict. 180 S.W.3d at 335, 339. 
It also reversed the directed verdict against Emerald on its claims against 
Exxon for fraud, negligent misrepresentation, and tortious interference, ruled against Exxon on its 
affirmative defense of limitations and remanded the claims for a new trial. 
Id. at 339. We granted Exxon’s petition for 
review and issued our opinion. The parties sought rehearing, which we 
granted.
II. LAW AND ANALYSIS
 
A. Statute of Limitations:
The Royalty Owners’ Claims for Statutory and Common Law 
Waste, and
Emerald’s 
Claims for Negligent Misrepresentation and Tortious 
Interference
            
The royalty owners’ claims against Exxon decided in this appeal are 
statutory and common law waste, breach of lease, and fraud.[6] Emerald’s claims against Exxon in this 
appeal are for fraud, negligent misrepresentation, and tortious interference. Exxon asserts that the claims are 
barred by limitations.[7] The parties do not dispute that a 
two-year statute of limitations applies to the waste, negligent 
misrepresentation, and tortious interference claims 
against Exxon. Tex. Civ. Prac. & Rem. Code § 16.003(a). Emerald’s 
claim for fraud and the Miesches’s claim for breach of 
lease are subject to four-year limitations periods and are addressed later in 
the opinion. See id. §§ 16.004, 
.051.
            
Causes of action accrue and statutes of limitations begin to run when 
facts come into existence that authorize a claimant to 
seek a judicial remedy. Provident Life & Accident Ins. 
Co. v. Knott, 128 S.W.3d 211, 221 (Tex. 2003); Johnson & Higgins of 
Tex. v. Kenneco Energy, Inc., 962 S.W.2d 507, 514 
(Tex. 1998). When a cause of action accrues is normally a question of 
law. Knott, 128 S.W.3d at 221; Moreno v. Sterling 
Drug, Inc., 787 S.W.2d 348, 351 (Tex. 1990).
            
In this case, more than two years elapsed between the time that Exxon’s asserted tortious 
conduct damaged the O’Connor Field and the date that Emerald and the 
Miesches sued Exxon. Emerald and the royalty owners 
assert that Exxon’s plugging operations caused them injury. Exxon advised the 
royalty owners by letter in August 1991 that it had completed plugging all wells 
in the O’Connor Field. Thus, the alleged tortious 
conduct occurred by August 1991. Emerald filed suit in June 1996, and the Miesches intervened in the lawsuit in August and September 
1996 to assert claims against Exxon. Both Emerald and the Miesches filed suit more than two years after the injuries 
occurred for these claims. However, Emerald and the royalty owners argue that 
the law recognizes exceptions to limitations that apply in this case.
            
Emerald and the royalty owners contend that they filed suit timely 
because Exxon fraudulently concealed its wrongful conduct, tolling the statute 
of limitations, and that the nature of their injuries was difficult to discover, 
thus delaying accrual of their claims. See Wagner & Brown, Ltd. v. 
Horwood, 58 S.W.3d 732, 736 (Tex. 2001) 
(distinguishing fraudulent concealment from the discovery rule); Computer 
Assocs. Int’l, Inc. v. Altai, Inc., 918 S.W.2d 453, 455–56 (Tex. 1996). At 
trial, the jury found that the royalty owners discovered, or in the exercise of 
due diligence should have discovered, on January 24, 1995, the waste committed 
by Exxon. On that date Emerald’s representatives met with the royalty owners and 
informed them, in the words of the court of appeals, “about the full extent of 
damage to the wells and the numerous discrepancies” in Exxon’s plugging reports. 
180 S.W.3d at 316. The court of appeals concluded that 
the statute of limitations was tolled until that date, that the lawsuit filed in 
the summer of 1996 was therefore timely, and affirmed the trial court’s 
judgment. Id. at 316–17. The court of appeals 
reasoned that “the discovery rule tolls limitations until the [royalty owners] 
knew of enough damage to know that the problems regarding the wells were not 
isolated.” Id. at 317. Emerald and the royalty 
owners do not dispute that, unless accrual of the cause of action is deferred or 
the statute of limitations tolled, the two-year statute 
of limitations bars all of their claims addressed by the court of appeals except 
fraud and breach of contract, which have four-year statutes of limitations. 
See Tex. Civ. Prac. & Rem. Code §§ 16.004, 
.051.
1. Conclusive Evidence of 
Emerald’s and
the 
Miesches’ Knowledge of Problems in the 
Field
 
            
We do not reach the question of the impact of the discovery rule or 
fraudulent concealment on the limitations period for the pending claims because 
Emerald and the royalty owners had actual knowledge more than two years before 
they filed suit of Exxon’s alleged wrongful actions and that those actions 
caused problems or injuries to their interests. The evidence of their actual 
knowledge is in documents written by or on behalf of Emerald and the Miesches, and it is conclusive. We review the relevant, 
undisputed facts.
            
Exxon completed 121 wells in the O’Connor Field and produced both oil and 
gas over the nearly forty years the parties did business together. By the mid 
1980s mineral prices dropped, and production in the Lease declined. Exxon 
believed the Field was becoming unprofitable at the fifty percent royalty and 
attempted to negotiate a lower royalty with the Miesches. The effort was unavailing, and in the late 1980s 
Exxon plugged wells in anticipation of terminating the Lease. The royalty owners 
were not obligated to accept a lower royalty and they were not convinced that 
the Field was uneconomic. The Miesches advised Exxon 
by letter dated September 12, 1990 that they had received notice that it 
intended to plug and abandon six wells referenced in the letter. The letter was 
a “formal demand not to plug the above referenced six wells, as such would cause 
us irreparable harm and commit waste,” and “would be contrary to public policy 
and laws.” Two weeks earlier, counsel for the Miesches 
had also warned Exxon in writing that it would “be sued under the terms of the 
lease and the common law, both for present breach of contract and anticipatory 
damages” if it plugged and abandoned wells in the Field capable of producing in 
paying quantities. In their Fourth Amended Petition in Intervention (the live 
pleading at trial), the royalty owners alleged, separate from their claim 
for breach of an implied covenant under the Lease to reasonably develop the 
Field, that they “lost royalties due to [Exxon’s] holding the lease but plugging 
wells instead of producing them.” Therefore, by September 1990, the royalty 
owners had actual knowledge of facts underlying their claim of waste by Exxon 
for failure to produce available reserves of oil and gas from existing wells on 
the O’Connor Lease.
            
Notwithstanding this evidence, even if we assume that the royalty owners 
were not aware of problems allegedly impacting their lease interests by Exxon’s 
plugging the wells by the time of the September 1990 letter, they assuredly were 
aware by August 16, 1991. That is the date of Exxon’s letter advising them that 
it had completed plugging and abandoning the remaining wells in the O’Connor 
Field. Accordingly, limitations forecloses the royalty 
owners’ waste claim.
            
On rehearing, the royalty owners argue that their claim for waste 
actually focused on intentional damage or sabotage to wells in the Lease.[8] The first claim, discussed above, 
was waste occasioned by abandoning wells that were alleged to still be capable 
of producing in paying quantities. The second claim was for waste allegedly 
caused by sabotaging the wells as they were plugged. The royalty owners alleged 
that Exxon intentionally damaged the wells to hinder or preclude subsequent 
re-entry of the wells causing increased re-entry costs, loss of some wells 
necessitating drilling new wells in some instances, and reduction in revenues 
they could recover from the O’Connor Field. The wrongful conduct alleged 
included improperly cutting production casing in the wells, placing junk in the 
wells, placing plugs in the wells below the surface at undisclosed locations, 
and pumping contaminants into the wells. They pled that Exxon’s conduct damaged 
the leasehold and interfered with the business opportunity of the royalty owners 
to further develop the Field with another operator.
            
Assuming these allegations are true, which we must for limitations 
analysis, Emerald and the royalty owners were aware of or suspected problems 
resulting from Exxon’s conduct well before they filed suit. In a June 8, 1994 
report, Emerald advised the royalty owners that it discovered that Exxon 
improperly cut casing in a number of wells and there was “junk” in at least one 
well Exxon had plugged. The Miesches also acknowledge 
that Emerald had discovered junk in at least one other well. The royalty owners 
argue that Emerald’s report to them in June 1994 discussing cut casing and junk 
in a wellbore did not raise suspicion and does not constitute knowledge of 
damage to the wells. They also claim that the June 1994 letter does not say that 
Exxon put junk in the wells. The royalty owners’ arguments contradict conclusive 
evidence from the trial, which we set forth in some detail below.
            
The royalty owners hired Emerald to redevelop a portion of the O’Connor 
Field after the Lease was terminated. Emerald prepared the June 1994 report for 
the royalty owners on the status of its efforts to reopen part of the Field. It 
states, in relevant part:
            
• “casing had been cut by Exxon at 1400'” for the M.E. O’Connor A-8 
well,
            
• “[c]asing had been cut by Exxon” for the M.E. 
O’Connor B-11 well,
            
• “[c]asing had been cut by Exxon” for the M.E. 
O’Connor E-3 well,
• “[c]asing was cut by Exxon when plugged” for the M.E. O’Connor 
A-5 well,
• “[c]asing was cut when plugged. . . Could not drill past cuts at 
1350'” for M.E. O’Connor B-1 well,
 
            
• “[c]asing cut by Exxon when plugged” for M.E. 
O’Connor E-6 well,
• “[c]asing cut by Exxon when plugged. . . . Casing shifted and 
collapsed” for M.E. O’Connor A-3 well, and
 
            
• Emerald “encountered junk in hole” for the M.E. O’Connor A-10 well.[9]
In addition to junk in well A-10, the 
report points out that Emerald discovered cut casing in seven wells prior to 
June 8, 1994. Emerald’s principal, Glenn Lynch, testified at length at trial 
that leaving cut casing in oil wells before sealing them with cement is an 
improper plugging technique that creates costly and time-consuming problems to 
re-entering the well for further mineral production, rendered some plugged wells 
impossible to re-enter and, he believed, was prohibited by Railroad Commission 
rules.[10] Lynch testified that if casing is cut in 
the wellbore, it should be pulled. Emerald found cut casing in “the first couple 
of wells” it attempted to re-enter when it began re-entry of the Field in May 
1993.
            
The alleged junking of the wells and cutting of production casing in the 
wellbores prior to capping the wells is the conduct that Emerald and the royalty 
owners characterize as deliberate sabotage of the wells, as violations of Texas 
laws and Railroad Commission regulations, and as constituting “illegal steps to 
intentionally and systematically damage the wells to prevent re-entry.” There is 
no dispute that Exxon was responsible for plugging the wells in the Field, and 
the June 1994 report identifies Exxon throughout the report as the party that 
had cut well casing in plugging the wells in the O’Connor Field. That was no 
surprise to Emerald or the royalty owners because Exxon had been the operator in 
the O’Connor Field for nearly four decades.
            
The royalty owners argue that they did not appreciate the significance of 
the statements in the report Emerald sent to them in June 1994. Neither the Miesches nor Emerald contest 
that the damages Exxon allegedly caused to the leasehold occurred before 1992 
or that Emerald and the Miesches knew of 
improper plugging, cut casing, and junk placed in capped wells in the Field 
before August 1994, at least to the extent documented in the June 1994 report. 
The Miesches contend that the evidence of cut casing 
is not notice that the wells were damaged or the Field was impaired. However, 
their live pleadings alleged that junk was left in the wellbores, casing was cut 
in multiple places in the well holes, and these acts of Exxon were the proximate 
cause of damages to the royalty owners. By June 1994, the royalty owners had 
actual knowledge of this alleged injury-causing conduct. The September 1990 
letter (from the Miesches to Exxon threatening to sue 
for waste if wells were plugged) and the June 1994 report (the Emerald 
report to the Miesches alleging damage to the wells) 
by their terms conclusively establish that the royalty owners knew or suspected 
there were problems or damages allegedly caused by Exxon to their interests in 
the O’Connor Lease. The limitations period began to run no later than September 
1990 on the first waste claim and no later than June 1994 on the second waste 
claim. Having actual notice of such problems, the royalty owners had two years 
under the applicable statutes of limitations to investigate the problems and 
file suit, or not.
            
Emerald contracted with the royalty owners in May 1993 to re-enter wells 
and further develop a portion of the Field. It admits to encountering problems 
in its initial re-entry attempts in 1993. The June 1994 report, which lists the 
re-entry date for some of the wells, expressly notes that re-entry was commenced 
in the prior year (1993) for several wells (A-5, B-1, and E-6) and that Exxon 
had cut the casing in these wells. Emerald also acknowledges that it performed 
“due diligence in accord with industry practice by reviewing Exxon’s sworn 
Railroad Commission filings” before entering the lease with the Miesches in May 1993. And, Glenn Lynch, a principal in 
Emerald, testified that eighty to ninety percent of the Commission filings, on 
which Emerald relied, were inaccurate and that cut casing caused significant 
problems to re-entry. Thus, Emerald’s 1994 report indicates its belief that 
Exxon’s actions allegedly caused further development in the Field to be more 
difficult, more costly, or impossible and that many problems in the wells were 
not listed in Railroad Commission reports, at least some of which Emerald had 
admittedly reviewed prior to entering the lease in 1993.
            
Emerald filed suit in July 1996, more than two years after the accrual of 
its causes of action for tortious interference with 
business opportunity and for negligent misrepresentation arising from allegedly 
false Railroad Commission filings. The Miesches 
claimed damages for waste when they intervened in August 1996, more than two 
years after the September 1990 letter and the June 1994 report. These claims 
were untimely.
            
The court of appeals concluded that the royalty owners were not on 
notice of the damage to the Lease until January 1995 when the “[royalty owners] 
knew of enough damage to know that the problems regarding the wells were not 
isolated.” 180 S.W.3d at 317 (citation omitted). The 
applicable legal standard is the statute of limitations begins to run when a 
party has actual knowledge of a wrongful injury. Knott, 128 S.W.3d at 221. Once a claimant learns of a wrongful 
injury, the statute of limitations begins to run even if the claimant does not 
yet know “the specific cause of the injury; the party responsible for it; the 
full extent of it; or the chances of avoiding it.” PPG Indus., Inc. v. 
JMB/Houston Ctrs. Partners Ltd. P’ship, 146 S.W.3d 79, 93-94 (Tex. 2004) (internal 
citations omitted); Velsicol Chem. Corp. v. 
Winograd, 956 S.W.2d 529, 531 (Tex 1997) (holding 
that the statute of limitations on claim for damage to real property ran as soon 
as property owner knew of presence of a hazardous chemical on the property, not 
when the residue exceeded regulatory contamination levels). Emerald and the 
Miesches had actual knowledge by June 1994 that there 
were problems re-entering a number of wells in the O’Connor Field due to cut 
casing or junk. After being put on notice of the alleged harm or injury-causing 
actions, the claimant must exercise reasonable diligence to investigate the 
suspected harm and file suit, if at all, within the limitations period. HECI 
Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998) (holding that 
“[r]oyalty owners cannot be oblivious” to potentially 
injurious activity taking place in the field); KPMG Peat Marwick v. Harrison 
Cnty. Housing Fin. Corp., 988 S.W.2d 746, 750 
(Tex. 1999) (noting that a plaintiff’s known loss from a wrongful premature sale 
of assets should have caused the plaintiff to investigate the mismanagement of 
the assets as well as a different defendant’s involvement in the mismanagement); 
Mooney v. Harlin, 622 S.W.2d 83, 85 (Tex. 1981) 
(holding that the statute of limitations runs from the time fraud could have 
been discovered). Knowing that there were problems with re-entering wells in 
1993 and documenting them in the June 1994 report, put 
Emerald and the Miesches on notice of actual or 
potential injury-causing conduct. Therefore, for limitations purposes, they had 
a duty to diligently investigate the suspected similar harm by the same operator 
in the O’Connor Field and file suit on these claims within two years of such 
notice.
            
The logic of the court of appeals’ holding would create serious issues 
with application of legislated deadlines for filing actions where injury-causing 
conduct is known but the full extent of the damages may not be known. In this 
case, the law accorded both Emerald and the Miesches 
the statutory two-year period to investigate the problems raised by Emerald and 
to file claims for damages arising from Exxon’s alleged conduct in the Field. 
The limitations period began when facts came into existence that authorized them 
to seek a judicial remedy. See Knott, 128 S.W.3d at 
221. A different rule that delays accrual of the cause of action until 
the putative claimant knew of enough damage to know the problems regarding the 
wells were not isolated, would cause inconsistent and illogical results. Such a 
rule would extend the limitations period for a suit arising from the 
eight wells, known from the June 1994 report to be damaged, beyond 
the two-year period because, even though those wells were known to be damaged, 
limitations would not run until many more wells were known to be damaged. 
Alternatively, application of such a rule would mean that limitations may begin 
to run on the wells with known damage but not on other wells in the Field, 
setting up multiple limitations periods to be applied to different wells in the 
same Field for the same types of damage caused by the same operator during the 
same period of time, and undermining or eviscerating the legal duty of an 
injured party to be diligent in protecting his interests. This is not to mention 
the difficult and litigious problem of determining when there are enough 
problems that they are not considered to be isolated. 
Here, unlike PPG Industries, Emerald alleged consistent problems with a 
high percentage of wells from the beginning of its re-entry efforts. See 
146 S.W.3d at 93–94. For these and other reasons, we 
have held that when a person is on notice of injury-causing conduct, the 
claimant has a duty to use reasonable diligence to discover if he has a claim 
and, if so, to file it within the limitations period to preserve his right to 
recover. HECI Exploration Co., 982 S.W.2d at 
886.
2. Royalty Owners’ Testimony 
Concerning
Emerald’s June 1994 Report of Problems in the 
Field
 
            
The June 1994 report establishes that Emerald and the royalty owners were 
made aware of problems caused by Exxon. Emerald prepared the report and sent it 
to the royalty owners. The trial testimony of the royalty owners concerning this 
document confirms their knowledge by June 1994 of problems in Exxon’s capping of 
the wells. Three royalty owners testified at trial—T. Michael O’Connor, Morgan 
Dunn O’Connor, and Laurie T. Miesch. T. Michael 
O’Connor and Morgan Dunn O’Connor discussed the June 1994 report. Laurie Miesch did not.
            
Royalty owner T. Michael O’Connor was a key representative for the 
royalty owners. At trial he testified:
Question:         
So, would you agree with me now, Mr. O’Connor, that at least for chronology[’s] 
sake, that in June of ’94, you were advised by Mr. Taylor [of Emerald] of 
problems they were having reentering the wells because of cut casing and junk 
in the hole?
 
O’Connor:       Right here 
from what I saw from this [June 1994] report that I’ve seen—I don’t remember it, 
of course, but—yes, they reported that they had some problems with some 
wells.
 
Question:         
You don’t—you’re not suggesting that you didn’t receive this letter, are 
you?
 
O’Connor:       
No, I apparently did if it was in my deposition in my file.
(Emphasis added.) O’Connor explained 
that Emerald advised in the June 1994 report that it encountered problems 
re-entering the wellbores due to cut casing and “junk in the hole.” Emerald 
contends in its post-submission brief that “T. Michael O’Connor [quoted above] 
did not understand the [June 1994] letter to mean that Exxon had done anything 
to deviate from industry standards or had damaged the wells.” O’Connor did not 
state that the report was insignificant or that it did not make him aware of any 
problems with plugging in the Field. He testified, as cited above, that the 
report advised of problems with re-entering the wells. He also testified that he 
was aware of “problems” in Exxon’s abandonment of the field, “but I figured it 
was not necessarily showing some kind of trend of a problem until they came to 
us in January ’95,” referring to Emerald’s meeting with the royalty owners to 
explain the extent of damage to wells in the Field. Knowledge of damage to 
interests need not rise to the level of a “trend” before claimants are charged 
under the law with notice of its occurrence. As PPG Industries states, 
knowledge of “actual causes and possible cures” or “the full extent of the 
injury” is not necessary to preclude application of the discovery rule. 146 S.W.3d at 93–94. Knowledge of injury initiates the 
accrual of the cause of action and triggers the putative claimant’s duty to 
exercise reasonable diligence to investigate the problem, even if the claimant 
does not know the specific cause of the injury or the full extent of it. 
Id.
            
Not having oil and gas expertise, Morgan Dunn O’Connor, a “spokesperson 
[and] organizational person” for the royalty owners, explained that she “had no 
idea what the significance of shifting casing was,” in reference to a November 
1994 letter from Emerald employee Johnny Yocham 
mentioning the term. Lynch had testified that cutting production casing without 
pulling it from the well in capping operations may allow the casing to shift 
such that re-entering a well with offset casing in the well would be difficult 
if not impossible. Notwithstanding the limits of her technical knowledge, Morgan 
Dunn O’Connor affirmed that she knew from the June 1994 report that Exxon had 
cut casing, which had shifted and collapsed in wells it capped in the Field, and 
also knew of junk left in a well Exxon had capped.
            
The Miesches claim that these actions by Exxon 
were intentional acts of sabotage, violated the law, and caused them substantial 
damages. Although it is not within the scope of our review to determine whether 
these assertions are true or not, we cannot escape the significance of the 
documents in the record or these statements by and to the Miesches in light of the question we answer—whether the 
royalty owners were on notice more than two years before filing suit of Exxon’s 
alleged conduct that they claim caused the damages. The inescapable 
conclusion is that the royalty owners were aware no later than June 1994 
from undisputed facts of conduct they suspected or knew allegedly injured their 
property interests. See City of Keller v. Wilson, 168 S.W.3d 802, 
814–17 (Tex. 2005) (explaining that courts conducting a no-evidence review 
cannot ignore evidence that has one logical conclusion).
            
We therefore conclude that the assertion of fraudulent concealment to 
toll limitations and of the discovery rule to postpone accrual of the 
limitations period are unavailing here. Irrespective of the potential effect of 
fraudulent concealment or the discovery rule on limitations, actual knowledge of 
alleged injury-causing conduct starts the clock on the limitations period. 
See KPMG, 988 S.W.2d at 750. Emerald’s claims 
for negligent misrepresentation and tortious 
interference with business opportunity are barred by limitations. The royalty 
owners’ claims for statutory and common law waste are barred by 
limitations.
B. Breach of 
Lease
            
The royalty owners claim that Exxon failed to “fully develop” two 
productive zones in the O’Connor Field, H12 and FS75, in violation of the 
Lease’s development clause. Exxon counters that the royalty owners misread the 
term “fully develop” in the development clause, Article 3, and instead 
incorporate a provision from Article 4 that is a separate covenant that does not 
define Exxon’s obligation to develop the Field. The court of appeals affirmed 
the trial court’s judgment, holding that the testimony of the royalty owners’ 
expert, George Hite, was some evidence that the Field was capable of further 
production in paying quantities until 1999 and that Exxon did not drill and 
complete wells in two productive zones, H12 and FS75.[11] 180 S.W.3d at 334–35. Exxon contends no 
evidence supports the jury’s finding that Exxon failed to fulfill its 
obligations under the development clause of the oil and gas Lease.[12]
            
There are four oil and gas lease agreements, and the development clauses 
in them have somewhat different terminology. At trial, the parties used the 
Lease as the source of the terms and conditions of the parties’ obligations, and 
Exxon acknowledged that the terms of the leases were similar.[13] The development 
clause is Article 3 of the Lease. Article 4 also contains relevant 
provisions.
Article 3(a). 
[L]essee covenants and agrees to prosecute diligently 
a continuous drilling and development program until said tract is fully 
developed for oil or gas.
 
. . .
 
First Tract shall be deemed fully developed within the 
preceding paragraph of this Article if found to be productive of oil or gas or 
sulphur when there has been drilled to each horizon or 
stratum capable of producing oil or sulphur one (1) 
well for the number of acres fixed by the Railroad 
Commission . . . in determining the spacing pattern applicable to 
said First Tract; in the absence of such determination of a spacing pattern by 
said Railroad Commission . . . said First Tract shall be 
deemed fully developed when at least one (1) well has been drilled 
and completed in each horizon or stratum capable of producing oil or sulphur in paying quantities for each twenty (20) acres of 
said tract. First Tract shall be deemed fully developed within the intent 
of the preceding paragraph if found to be productive of gas only when one (1) 
well has been drilled and completed to each horizon or stratum capable of 
producing gas in paying quantities for the number of acres fixed by the Railroad 
Commission . . . in determining the spacing pattern applicable to 
said tract for the production of gas, or, in the absence of such determination, 
one (1) well for each one hundred sixty (160) acres of said tract so capable of 
producing gas in paying quantities.
 
Article 
4. By the words “with diligence,” “diligence,” or 
“diligently,” as used in this instrument, is meant, in each instance, that 
degree of action, conduct and effort which is consistent with that which would 
characterize the action and conduct and effort of a prudent and skillful oil 
operator possessed of ample equipment, material and money, and unhampered by 
obligations to third parties, and actuated by an honest desire to carry out and 
fulfill in good faith each and every obligation imposed upon the lessee by this 
lease. Lessee shall always develop and operate the leased premises for the 
production of oil and gas in accordance with the best practices of the industry 
at the applicable time, to the end that the full value of the leased premises 
for oil and gas shall be ascertained, conserved, and 
realized.
 
(Emphasis 
added.)
            
Before we address the legal sufficiency of the evidence, we must first 
determine the scope of Exxon’s development obligations under the Lease. “An oil 
and gas lease is a contract, and its terms are interpreted as such.” Tittizer v. Union Gas Corp., 171 S.W.3d 857, 
860 (Tex. 2005); accord Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 
662 (Tex. 2005) (interpreting an oil and gas lease using contract 
principles). “In construing an unambiguous oil and gas lease, . . . we seek to enforce the intention 
of the parties as it is expressed in the lease.” Tittizer, 171 S.W.3d at 
860.
1. General 
Development Obligation—Article 3
            
The Lease contains a development clause, Article 3. The general 
development obligation in Article 3(a) relied on by the Miesches requires Exxon to “prosecute diligently a 
continuous drilling and development program until said tract is fully 
developed for oil and gas.” (emphasis added). The 
next paragraph of Article 3(a) then provides definitions of “fully developed” 
for oil and gas.
2. The 
Obligation to “Fully Develop”—Article 3
            
The Field “shall be deemed fully developed within the intent of the 
preceding paragraph of this Article” when at least one well has been drilled and 
completed in each horizon capable of producing oil or gas in paying quantities 
for each twenty acres of land for oil production and for each 160 of land for 
gas production.[14] This is a common definition in an oil 
and gas lease development clause. 4 Howard R. Williams & Charles J. Meyers, 
Oil and Gas Law § 671.4, at 136.1 (3d ed. 
2008).
            
To understand the obligation to “fully develop,” one must know the 
meaning of “drill” and “complete” in the development clause. The Lease does not 
define “drill” or “complete.” It is a well recognized canon of construction that 
technical words are to be interpreted as usually understood by persons in the 
business to which they relate, unless there is evidence that the words were used 
in a different sense. Barrett v. Ferrell, 550 S.W.2d 
138, 142 (Tex. Civ. App.—Tyler 1977, writ ref’d n.r.e.). In oil and gas parlance, “drilling” refers 
to the “[a]ct of boring a hole through which oil and/or gas may be produced if 
encountered in commercial quantities.” 8 
Howard R. Williams & Charles J. Meyers, Oil and Gas Law: Manual of Oil and 
Gas Terms at 281–82 (3d ed. 2008). A “completed well” 
refers to “a well capable of producing oil or gas.” Id. at 
172 (emphasis added). The “completion of a well” can also refer to “those 
processes necessary before production occurs [such as] perforating the casing 
and washing out the drilling mud.” Id. at 
174.
            
Certainly, the parties can define the operator’s duty to drill and 
complete a well differently under a contract. For example,
[c]ompensation for drilling an 
oil or gas well may be made contingent upon the discovery of oil or gas in 
paying quantities, but a contract will not be so construed in the absence of a 
clear expression or implication of such intent by the contract . . . . The courts in 
construing contracts for the drilling of wells are not disposed to imply 
warranties as to production.
 
Barrett, 550 S.W.2d at 142 (holding that a 
well was completed even though it was a dry hole) (citing W.L. Summers, The Law of Oil and Gas § 687 (perm. ed. 
1938)). These definitions in the Lease show that for a well to be considered 
“drilled and completed” as required by the development clause, a hole must be 
bored in the ground, and if oil or gas in paying quantities is encountered, the 
casing must be perforated or otherwise prepared for production. The Article 3(a) 
development clause does not obligate the operator to produce all oil and gas 
that can be produced in paying quantities. The duty is to drill and complete at 
least one well “capable” of producing in paying quantities. The term “in paying 
quantities” specifies a characteristic of the well to be drilled, not the volume 
of production required. The royalty owners’ statement of the duty omits the “in 
paying quantities” term, but all four definitions in the Lease of “fully 
develop” in Article 3(a) for oil and for gas in each tract includes this 
language.[15]
            
This definition of a completed well in the treatises, where the term is 
not defined in an oil and gas lease, is also the one recognized by Texas courts. 
See id. at 142 (citing Cannon v. Wingard, 355 S.W.2d 776, 780 (Tex. Civ. App.—Dallas 
1962, writ ref’d n.r.e.)). A 
“well need not be a producing well to be completed”; it only needs to be capable 
of producing oil or gas. Id.; Seale v. Major Oil Co., 428 S.W.2d 
867, 869 (Tex. Civ. App.—Eastland 1968, no writ) (noting that completion of a 
well does not mean it is an oil or gas producer, but “refers to completion of 
the required work on the well whether it becomes a producer or 
not”).
 
3. Diligence—Article 4
 
            
Article 4 of the Lease contains two sentences. The first sentence defines 
“diligence,” a term used in the general development clause in Article 3(a). It 
is defined as the conduct of a prudent and skillful oil operator actuated by an 
honest desire to fulfill in good faith each obligation in the Lease. Although 
not argued to the court of appeals or mentioned in the court of appeals’ 
opinion, the Miesches argue in this Court that the 
second sentence of Article 4 sets out the determinative language for defining 
Exxon’s duty to develop the Field:
            
Lessee shall always develop and operate the leased premises for the 
production of oil and gas in accordance with the best practices of the industry 
at the applicable time, to the end that the full value of the leased premises 
for oil and gas shall be ascertained, conserved, and 
realized.
 
Royalty owners argue, in effect, that 
this term is a warranty of a level of production—to produce all oil and gas in 
each zone per the specified acreage for each well that can be produced in paying 
quantities. While not an unreasonable agreement to strike, the question is 
whether the Lease contained that obligation given its somewhat less burdensome 
definition of the development obligation in Article 3(a), discussed 
above.
            
Articles 3 and 4 are the determinative provisions in the dispute over the 
development obligation.[16] The Miesches 
contend that under the Lease, Exxon was required to develop the tract fully by 
not only drilling and completing in each zone an oil well for every twenty acres 
and a gas well for every 160 acres, but also developing the oil and gas to 
realize the full value from each well in each horizon. They acknowledge that 
under Article 36, Exxon had a right to abandon the Lease, but contend it could 
do so only after producing the “full value” of oil and gas available in the 
O’Connor Field.[17]
            
At trial, the Miesches’ expert, Hite, opined 
that Exxon should have drilled or reworked an additional fifteen wells in the 
FS75 zone and additional wells in the H12 zone to fully develop those zones. 
Although he acknowledged that Exxon would have had to commit an additional $2 
million to continue producing from the Field, he opined that wells in those two 
zones would have produced oil and gas in paying quantities for an additional 
eight years after the Field was abandoned in 1991. However, in this Court, the 
royalty owners acknowledge that Exxon complied with the spacing requirements of 
Article 3 of the Lease—to complete at least one well in every zone for each 
twenty acres for oil and one well completed in every zone for each 160 acres for 
gas—and do not argue that Exxon had a duty to drill additional wells in the 
Field. Likewise, the Miesches do not argue that Exxon 
had a duty to drill additional wells in the H12 or FS75 
zones.
            
They take the position in this Court that Exxon breached the Lease by 
failing to produce all the oil and gas in horizons H12 and FS75 that was 
available in paying quantities from existing wells. Hite’s charts of the 
production from the wells in the O’Connor Lease were admitted at trial. The 
charts show that Exxon drilled at least one well in each zone and produced 
3,651,850 cubic feet of gas and 78,746 barrels of oil in zone FS75 and 1,728,728 
cubic feet of gas and 3,933 barrels of oil in zone H12. Hite agreed that Exxon 
drilled at least one well in FS75 and at least one well in H12 and both wells 
produced in paying quantities in each zone.[18]
            
The Miesches argue that Exxon “did not complete 
every well in the H12 and FS75 zones.” They also contend that the Article 3 duty 
to “complete” the wells required Exxon to produce all oil and gas in zones H12 
and FS75 available in paying quantities. The Miesches 
equate “complete” with the Article 3(a) duty to “fully develop” and define 
“fully develop” as fully realizing all oil and gas available in paying 
quantities in each zone per the specified acreage.
            
The royalty owners’ analysis of Articles 3 and 4 of the Lease contradict 
its express terms and do not harmonize the terms in those Articles. As we noted, 
Article 3(a) of the Lease expressly provides that the duty to fully develop is 
satisfied by only drilling one well in each zone per the designated acreage and 
preparing it for production, even in the unlikely event that no production 
occurs. That obligation is less onerous than producing all oil and gas available 
in paying quantities from the wells in the two zones. As a matter of law, Exxon 
completed wells in zones H12 and FS75 by not only drilling them and preparing 
them for production, but producing significant quantities of hydrocarbons from 
those zones, according to Hite’s numbers.
            
There is a difference between Article 3’s obligation to fully develop the 
tracts and Article 4’s obligation to realize the full value of the tracts. 
Fulfilling the duty in Article 3 to complete a well in each horizon would not 
satisfy Article 4. The former duty arises from the development clauses in 
Article 3. The royalty owners do not contend that Exxon had a duty to drill more 
wells, and likewise do not contend in this Court that the wells completed should 
have pierced additional zones in the Field. They concede that zones H12 and FS75 
were pierced by wells Exxon drilled but contend that the zones were not 
sufficiently worked to realize their full value. They contend that Article 4’s 
requirement to realize the “full value” of operations is incorporated into the 
general development obligation of Article 3, even though “fully developed” is 
the development duty specifically defined later in Article 3. Article 4 does not 
include this sentence in the definition of “diligence”; it defines “diligence” 
in the first sentence. The Miesches position would 
mean that “fully developed” means one thing in the general development 
obligation of Article 3(a) and something different in a latter paragraph of 
Article 3(a), which defines “fully develop” as drilling and completing at least 
one well in each zone on specified acreage for oil or gas production. There is 
no reference in Article 3 to an obligation to realize the full value of 
available hydrocarbons. To bridge that gap, the Miesches argue that “completing” a well, a term in the 
specific development obligation in Article 3(a), means realizing its full value 
per Article 4. But the Lease does not define completion of a well, and nothing 
in Articles 3 or 4 indicates that completion means to realize the full value, or 
all hydrocarbons available in paying quantities of each zone for the specified 
acreage. And the second sentence of Article 4 does not state that it is part of 
the definition of “diligently” or that it defines “completed” wells.[19]
            
Hence, under one interpretation of the Lease, we are confronted with two 
different duties, both expressly set forth in the Lease and one contradictory to 
the other.[20] Where an 
ambiguity has not been raised by the parties, the interpretation of a contract 
is a question of law. Seagull Energy E&P, Inc. v. Eland 
Energy, Inc., 207 S.W.3d 342, 345 (Tex. 
2006). The duty to fully develop in Article 3(a) is less 
onerous and is inconsistent with a duty to fully develop as defined by the Miesches in Article 4. We attempt to harmonize these 
provisions while giving effect to both. If the second sentence of Article 4 is 
the preeminent duty, it would vitiate the definition of “fully develop” in 
Article 3(a). See Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 662 
(Tex. 2005) (holding that courts should harmonize the provisions of a contract 
such that none are rendered meaningless). Article 3 provides the definition of 
this duty. It expressly defines “fully develop” and states that the tracts of 
land “shall be deemed fully developed within the intent of the preceding 
paragraph.” (Emphasis added). The preceding paragraph is the general 
development obligation that introduced the term “fully develop” in the Lease; 
the second paragraph in Article 3(a) defines “fully develop.” Article 3(a) is 
more specific than Article 4 in addressing the development obligations in the 
Lease. See Forbau v. Aetna Life Ins. Co., 876 
S.W.2d 132, 133–34 (Tex. 1994) (noting that a specific contractual provision 
controls over the general provision concerning the same issue); Southland 
Royalty Co. v. Pan Am. Petroleum Corp., 378 S.W.2d 50, 57–58 (Tex. 1964) 
(holding specific provision for payment of gas royalty controls over a less 
specific provision).
            
The second sentence of Article 4 includes aspirational terminology that Exxon operate in accordance 
with the best practices of the industry “to the end” and that the full value of 
the Lease be “ascertained, conserved and realized.” Article 3(a)’s development 
language is mandatory.
            
Clearly the extent of the duty to develop was defined by the parties in 
Article 3. Holding that Article 4 trumps this defined duty would render 
meaningless Article 3(a)’s specifically defined obligation to “fully develop” 
and potentially eliminate the spacing requirements for wells drilled in the 
Lease and require more wells (subject to applicable Railroad Commission 
regulations) to fully realize the mineral horizons. Where the Lease expressly 
defines the duty, we will not impose a more stringent obligation unless it is 
clear that the parties intended to warrant production beyond that defined 
obligation. See Barrett, 550 S.W.2d at 142. This 
reading of the Lease harmonizes and gives effect to both articles. We conclude 
that the parties’ expressed intent was to define in Article 3(a) the duty of the 
operator to develop the O’Connor Field. The aspirational language in Article 4 informs the duties in 
Article 3 such that they should be performed in accordance with the best 
practices of the industry with the goal of fully developing the 
tracts.
4. Evidence of 
Fulfillment of Development Duty
            
Having ascertained the scope of Exxon’s development obligations, we now 
turn to Exxon’s argument that the evidence is legally insufficient to support 
the breach of lease claim. Because Exxon is attacking the legal sufficiency of 
the evidence supporting an adverse finding on an issue for which it did not have 
the burden of proof, Exxon must show that no evidence supports the jury’s 
adverse finding. See Croucher v. Croucher, 660 S.W.2d 55, 58 
(Tex. 1983). Evidence is legally sufficient if it “would enable reasonable and 
fair-minded people to reach the verdict under review.” City of Keller, 
168 S.W.3d at 827. We “credit favorable evidence if 
reasonable jurors could, and disregard contrary evidence unless reasonable 
jurors could not.” Id.
            
Hite testified that “fully developed” means there are a “sufficient 
number of wells in it to get the reserves.” And when asked whether Exxon 
completed “in the FS75 and the H12, in every well, that Exxon had good 
probability of producing oil and gas in those two zones,” he answered “[n]o, 
they didn’t.” However, when asked whether “drilling the H12 and completing it in 
two wells complete[d] that zone in the wells on this tract that would penetrate 
that zone in paying quantities,” he answered “[i]f 
your question is, did the two wells fully develop the lease, the answer is no.” 
Asked whether the wells Emerald completed in FS75 were “completed in a 
fully-developed manner,” he answered “[n]o, it was not.” Hite opined that Exxon 
violated the Lease by not producing more extensively, or exhausting the 
production, from the wells in zones H12 and FS75. He testified that zones H12 
and FS75 had remaining reserve potential and that Exxon had information 
indicating they “could have been developed further.”
            
Hite’s stated assumption for his opinions is that “fully develop” meant 
to fully exploit the reserves in zones H12 and FS75. As we explained, the duty 
undertaken under the language of the development clause is to fully develop, not 
fully exploit the zones. Under the contractual standard in the Lease, the 
evidence does not support Hite’s conclusions. Hite’s charts of the production 
from the wells in the O’Connor Lease, admitted at trial, show that Exxon drilled 
at least one well in each zone and produced 3,651,850 cubic feet of gas and 
78,746 barrels of oil in zone FS75 and 1,728,728 cubic feet of gas and 3,933 
barrels of oil in zone H12. The royalty owners 
submitted evidence establishing that Exxon drilled at least one well in both 
zones FS75 and H12 and both wells produced in paying quantities. They also 
conceded that the well spacing requirements were met. Evidence that further 
development potential existed when Exxon abandoned the leasehold in 1991 is no 
evidence that Exxon failed to comply with the parties’ obligations embodied in 
the development clause. And evidence that Exxon did not fully 
exploit the reserves in FS75 and H12 is no evidence that Exxon did not “drill 
and complete” the requisite number of wells for zones FS75 and H12. The 
evidence establishes that Exxon completed at least one well capable of producing 
in paying quantities in each zone for every twenty acres for oil and every 160 
acres for gas. Therefore, we reverse the court of appeals’ judgment and render 
judgment in favor of Exxon on the royalty owners’ breach of lease claim.[21]
C. 
Fraud
            
Unlike most of Emerald’s and the royalty owners’ other claims, which have 
a two-year statute of limitations, the statute of limitations for fraud is four 
years. Tex. Civ. Prac. & Rem. 
Code § 16.004(a)(4). The statute of limitations for fraud begins to run from 
the time the party knew of the misrepresentation. Little v. Smith, 943 
S.W.2d 414, 420 (Tex. 1997) (“[T]he statute does not begin to run until the 
claimant knew or should have known of facts that in the exercise of reasonable 
diligence would have led to the discovery of the wrongful act.).
            
Emerald claims that Exxon committed fraud by filing plugging reports 
(W-3s) with the Railroad Commission that deliberately misrepresented that it 
properly plugged the wells when it did not. That conduct allegedly caused 
Emerald increased costs to re-enter wells and made re-entry of some wells 
impossible resulting in loss of revenues. At trial, the royalty owners asserted 
fraud both for filing false W-3s and misrepresenting the remaining reserves in 
the O’Connor Field. At the court of appeals, having recovered on other claims, 
the Miesches conditionally appealed the trial court’s 
fraud judgment but only on the issue of the remaining reserves.
            
The trial court granted Exxon’s motion for directed verdict on both 
Emerald’s and the Miesches’ fraud claims, therefore, 
there was no fact finding identifying the dates that Emerald learned of alleged 
false plugging reports or that Exxon allegedly misrepresented the reserves to 
the royalty owners. However, Emerald notes that “the first place subsequent 
operators turn is to those very filings at the Railroad Commission when deciding 
whether redevelopment can be economically undertaken.” Lynch testified that 
Emerald reviewed the W-3s for the Field. The June 1994 letter states that 
Emerald encountered cut casing in the wells on the O’Connor Lease in 1993 and 
junk in the well prior to June 1994. Thus, Emerald may have learned about the 
asserted misrepresentations on or around that date. Based on either of these 
dates, the fraud claim filed by Emerald would be timely, and therefore, we reach 
the merits of Emerald’s fraud claim.[22]
1. Emerald’s 
Fraud Claim
            
The court of appeals reversed the trial court’s directed verdict on 
Emerald’s fraud claim, holding that the jury should have been allowed to 
consider whether the evidence was sufficient to establish fraud. It asserted 
that the evidence did not conclusively disprove the intent-to-induce reliance 
element of the fraud claim. In reviewing a trial court’s directed verdict, we 
examine the evidence in the light most favorable to the person suffering an 
adverse judgment and decide whether there is any evidence of probative value to 
raise an issue of material fact on the question presented. Henderson v. Travelers Ins. Co., 544 S.W.2d 649, 650 (Tex. 
1976). We do not hold that public filings, such as Railroad Commission 
reports, alone satisfy the intent-to-induce reliance element of fraud. We 
conclude there was some evidence presented at trial tending to show that Exxon 
knew, at the time it filed the plugging reports, of an especial likelihood that 
the identified future operators would rely on the inaccurate plugging reports. 
We, therefore, agree with the court of appeals on this issue.
            
A plaintiff seeking to prevail on a fraud claim must prove that 
(1) the defendant made a material misrepresentation; (2) the defendant 
knew the representation was false or made the representation recklessly without 
any knowledge of its truth; (3) the defendant made the representation with 
the intent that the other party would act on that representation or intended to 
induce the party’s reliance on the representation; and (4) the plaintiff 
suffered an injury by actively and justifiably relying on that representation. 
See DeSantis v. Wackenhut Corp., 793 S.W.2d 
670, 688 (Tex. 1990); Trenholm v. Ratcliff, 646 
S.W.2d 927, 930 (Tex. 1983).
            
Emerald claims that Exxon committed fraud by misrepresenting material 
information in its plugging reports to the Railroad Commission with the intent 
that known lessees and lessors of such mineral 
interests would rely on the information in the future. Emerald claims, as a 
result of its reliance, that it is entitled to damages measured by “the value of 
lost wells and minerals, the additional costs of reentering those wells that 
were improperly plugged, [and] the increased risk of loss of producing zones and 
wells due to improper plugging.” The court of appeals held that evidence that 
Exxon knew that unidentified, subsequent lessees and operators might rely on 
Railroad Commission filings to make business decisions was sufficient to satisfy 
the intent-to-induce reliance element of fraud. 180 S.W.3d at 
337. Exxon argues that the court of appeals’ decision is erroneous for 
two reasons. First, Exxon argues there is no evidence that future operators 
would rely on the plugging reports because the reports’ only purpose is to allow 
the state to protect against pollution. Second, Exxon argues that Emerald’s 
approach reduces the intent-to-induce reliance element of fraud to mere foreseeability, counter to the Court’s analysis in Ernst 
& Young, L.L.P. v. Pacific Mutual Life Insurance Co., 51 S.W.3d 573, 580 
(Tex. 2001).
            
We begin with the duty to plug wells. “Proper plugging is the 
responsibility of the operator of the well.” 7 Tex. Reg. 3991 
(1982) (16 Tex. Admin. Code § 
3.14(c)(1)), amended by 23 Tex. Reg. 9304 (1998) 
(current version at 16 Tex. Admin. Code § 3.14(c)(1) 
(R.R. Comm’n of Tex., Plugging)). The Railroad 
Commission mandates:
Non-drillable material that would hamper or prevent 
re-entry of a well shall not be placed in any wellbore during plugging operations . . . . Pipe and unretrievable junk shall not be cemented in the hole during 
plugging operations without prior approval by the district director or the 
director’s delegate.
 
16 Tex. Admin. Code § 3.14(d)(10) (R.R. Comm’n of Tex., 
Plugging). Exxon argues that this section and similar plugging requirements are 
not intended to benefit future operators, but only to protect the environment. 
Thus, Exxon argues, no evidence supports Emerald’s argument that there was an 
especial likelihood that Exxon knew future operators would rely on the reports 
because that is not the reports’ purpose.
            
Although the Railroad Commission explained that it revised section 3.14 
“to protect fresh water in the state from pollution,” the plugging reports are 
not limited to this purpose. 7 Tex. Reg. at 3989. One 
of the objectives of the plugging regulations is to prevent plugging of wells 
that hinder or prevent re-entering wells, which could be desired by the same or 
subsequent owners or operators. Id. To police this regulation, the 
Commission requires that the W-3 plugging reports, be verified under oath, be 
filed within thirty days after the plugging is completed, and disclose the 
methods used to plug a well. Id. at 3991. Thus, 
the purpose of requiring operators to file plugging reports with the Commission 
is to ensure that operators follow a plugging procedure that not only prevents 
pollution, but also allows re-entry into the wells for commercial 
purposes.
            
However, the mere fact that subsequent lessees might or should rely on 
statements in Exxon’s plugging reports alone is not sufficient to establish 
an intent to induce reliance, as the court of appeals 
held and as Emerald argues. Ernst & Young, 51 
S.W.3d at 580. In Ernst & Young, we considered the proof 
necessary to establish the intent-to-induce reliance element of a fraud claim. 
Although we declined to decide whether to adopt the reason-to-expect standard 
outlined in section 531 of the Restatement (Second) of Torts, we concluded that 
this standard is consistent with Texas fraud jurisprudence. Id. Section 
531 provides:
One who makes a fraudulent misrepresentation is subject 
to liability to the persons or class of persons whom he intends or has reason to 
expect to act or to refrain from action in reliance upon the misrepresentation, 
for pecuniary loss suffered by them through their justifiable reliance in the 
type of transaction in which he intends or has reason to expect their conduct to 
be influenced.
 
Restatement 
(Second) of Torts 
§ 531 (1977). Like the defendants in Ernst 
& Young, Exxon argues that this approach reduces the intent-to-induce 
element to a foreseeability standard. We rejected that 
argument in Ernst & Young, holding that section 531’s 
“reason-to-expect standard requires more than mere foreseeability; the claimant’s reliance must be ‘especially 
likely’ and justifiable, and the transaction sued upon must be the type the 
defendant contemplated.” Ernst & Young, 51 S.W.3d at 580; see also 
Grant Thornton LLP v. Prospect High Income Fund, 314 S.W.3d 913, 922 (Tex. 
2010) (quoting Ernst & Young, 51 S.W.3d at 575). Evidence that 
reliance on false public information as part of a general industry practice is 
insufficient, as a matter of law, to prove an intent to 
induce reliance. See Ernst & Young at 581–82. Even an obvious risk 
that a misrepresentation might be repeated to a third party is not sufficient to 
satisfy the reason-to-expect standard. A plaintiff must show that “[t]he maker 
of the misrepresentation [has] information that would lead a reasonable man to 
conclude that there is an especial likelihood that it will reach those persons 
and will influence their conduct.” Restatement (Second) of Torts 
§ 531 cmt. d 
(1977), quoted in Ernst & Young, 51 S.W.3d at 581. The standard is 
not met if a defendant merely foresees that some party may rely on statements 
made in a public filing.
            
Therefore, if the evidence shows only that Exxon made material 
misrepresentations in its plugging reports to the Railroad Commission and knew 
that lessors and operators in the future may rely on 
the filings, such evidence would fail as a matter of law under the Ernst 
& Young standard. See Ernst & Young, 51 
S.W.3d at 581–82. Such a holding would open the cause of action to any 
person who subsequently relied on any public filings—including stocks and bonds, 
security interests, real property deeds, and tax filings—with few limits in 
sight. The intent-to-induce reliance element of fraud is a focused inquiry, more 
akin to a rifle shot than a shotgun blast. Intent-to-induce reliance is not 
satisfied by evidence that a misrepresentation may be read in the future by some 
unknown member of the public or of a specific industry.
            
Here, however, there is some evidence that Exxon knew of an especial 
likelihood that Emerald specifically would rely on the plugging reports in a 
transaction being considered at the time it filed the plugging reports. In 1990, 
Exxon concluded that it could no longer profitably operate the leases unless 
Exxon’s royalty obligation could be renegotiated. The negotiations failed, and 
Exxon abandoned the field, plugging the last well in the O’Connor Lease in 1991. 
In their letter of September 12, 1990 to Exxon, the royalty owners stated, “[W]e 
have located a group of oil and gas companies that are willing to accept the 
plugging obligations and an Assignment of the above referenced [six] wells [and 
certain acreage around each well].” They also offered their consent to assign 
all of Exxon’s right, title, and interest in the leases to several companies and 
indicated their interest in future oil and gas operations in the 
Lease.
            
In 1989, Pace Production Company expressed that it was “most 
anxious to proceed” with production in the O’Connor Lease and offered to 
purchase Exxon’s interest. It renewed its offer in January 1990. By letter of 
July 23, 1990, Exxon advised each of the royalty owners that Pace had expressed 
an interest in the Lease. On May 25, 1993, Pace West Production acquired the 
interests to develop the Lease from the royalty owners.
            
Exxon knew the royalty owners had a continuing interest in further 
developing the O’Connor Lease, received offers from the putative subsequent 
lessee to purchase Exxon’s interest in the Lease, and knew the transaction 
proposed by the Miesches and Emerald’s predecessors 
was the continued production of oil and gas in a portion of the Lease. Exxon 
argues that the company that made offers on the Miesches’ oil and gas interests was Pace Production Company, 
which is a different company than Emerald’s alleged predecessor Pace West 
Production. We searched the record to determine if there was legally sufficient 
evidence of this proposition. A May 25, 1993 “Agreement for Waivers” between 
Emerald and the royalty owners states that Emerald was “formerly known as Pace 
West Production, L.C., and also formerly known as Pace West Production, Ltd.” An 
undated “Memorandum of Amended Oil and Gas Lease and Security Agreement” also 
states that Emerald was formerly known as Pace West. Additionally, Glenn Lynch, 
a representative from Emerald, testified that Emerald “was formerly Pace West.” 
Royalty owner T. Michael O’Connor explained that Emerald was operating under 
another name, Pace West, when it made an initial offer to reopen some of the 
wells in the O’Connor Lease. This evidence raises a fact issue and precludes 
granting a directed verdict on the issue.
            
Thus, legally sufficient evidence in the record supports the claim that 
Exxon had information that would lead a reasonable person to conclude there was 
an especial likelihood Emerald would rely on Exxon’s allegedly inaccurate 
filings with the Railroad Commission. The question of whether the W-3s are 
inaccurate is not before us and we do not decide it. We hold that the trial 
court erred in granting a directed verdict on Emerald’s fraud claim on the 
ground that there was no evidence of the intent-to-induce element of the claim. 
Accordingly, the trial court’s grant of directed verdict on the fraud claim on 
this basis was in error.[23]
2. Royalty 
Owners’ Remaining Claims
            
At the court of appeals, the royalty owners defended the trial court’s 
judgment in their favor on the waste and breach of lease claims and 
conditionally challenged the trial court’s directed verdict on their claims for 
negligence, negligence per se, negligent misrepresentation, tortious interference with economic opportunity, breach of 
regulatory duty to plug wells properly, and fraud in allegedly making 
misrepresentations of the remaining reserves in the O’Connor Field. They 
asserted that their fraud claims are not precluded by the Lease and are 
supported by the evidence. The court of appeals upheld the trial court’s 
judgment in their favor and did not address the claims the royalty owners 
conditionally challenged. The royalty owners briefed the claims conditionally 
appealed to the court of appeals, but did not address those claims before this 
Court. They did, however, identify the unbriefed 
issues. We therefore remand those issues to the court of appeals.
III. CONCLUSION
            
We hold the royalty owners’ statutory and common law waste claims, and 
Emerald’s negligent misrepresentation and tortious 
interference claims are time-barred and reverse and render judgment for Exxon 
with respect to those claims. We also hold that the evidence conclusively 
establishes that Exxon satisfied its duty to develop the Field and reverse and 
render judgment for Exxon with respect to the breach of Lease claim. We affirm 
the court of appeals’ judgment, for different reasons, reversing the trial 
court’s directed verdict in favor of Exxon on Emerald’s fraud claim. Finally, we remand the case to the court of appeals (1)  to consider 
the royalty owners’ claims for fraud, negligence, negligent misrepresentation, 
negligence per se, tortious interference with economic 
opportunity, and breach of regulatory duty to plug wells properly, and (2) to 
remand Emerald’s fraud claim to the trial court for trial.
 
                                                                                                                                                                                                
                
________________________________________
                                                                                                                                                                                                                
Dale Wainwright
                                                                                                                                                            
Justice
 
 
OPINION DELIVERED: December 17, 
2010









[1] We 
received amicus briefs from Texas Oil & Gas Association, the Texas Alliance 
of Energy Producers, the Texas Land and Mineral Owners’ Association, Texas and 
Southwestern Cattle Raisers Association, and Jerry Patterson, Commissioner of 
the Texas General Land Office and Chairman of the School Land Board. On 
rehearing, we received amicus briefs from Susan Combs, Texas Comptroller of 
Public Accounts, Jerry Patterson, Commissioner of the Texas General Land Office 
and Chairman of the School Land Board, Texas Oil & Gas Association and 
Jacqueline L. Weaver, A.A. White Professor, University of Houston Law 
Center.

[2] The 
current royalty owners who are petitioners in this case are: Morgan Dunn 
O’Connor, T. Michael O’Connor, Brien O’Connor, Kelly Patricia Dunn Schaar, Nancy O’Connor, Bridey 
Dunn Greeson, individually and on behalf of the 
Dunn-O’Connor Family Trust, Laurie T. Miesch, Jack 
Miesch, Michael L. Miesch, 
Molly Miesch Allen, and Janie Miesch Robertson.

[3] Title 
16 section 3.14 of the Texas Administrative Code requires well operators to file plugging reports, or W-3 forms, with 
the Railroad Commission within thirty days after each well is plugged. 16 Tex. Admin. Code § 
3.14 (R.R. Comm’n of Tex., Plugging). Section 3.14 
mandates that an operator disclose the specific methods used to plug the wells 
and sign an oath verifying that the statements in the report are true. 
Id.

[4] Exxon 
argues that Pace West is not the predecessor to Emerald Oil. The evidence of the 
identity of Emerald Oil’s predecessor raises a fact question on the issue and is 
discussed further in II.C., 
infra.

[5] Exxon 
does not dispute that it plugged at least some of the wells using non-standard 
plugging procedures and acknowledges that it cut the casing and cemented it in 
some of the wellbores.

[6] 
Emerald’s claims for statutory and common law waste, breach of regulatory 
duty to plug wells properly, and negligence per se were dismissed by the trial 
court in a partial summary judgment ruling, were severed at the trial court, and 
are the subject of the opinion on rehearing issued in the companion case, 
Exxon v. Emerald Oil & Gas Co., ___ S.W.3d ___ (Tex. 2010) 
(reh’g. op.). The Miesches’ 
claims for negligence, negligent misrepresentation, negligence per se, tortious interference and breach of regulatory duty to plug 
wells properly were dismissed by the trial court on directed verdict, and the 
Miesches conditionally challenged that ruling at the 
court of appeals.

[7] Emerald 
argues that “Exxon moved for directed verdict based on limitations on only one 
of Emerald’s three common-laws claims, i.e., negligent misrepresentation,” and 
thus failed to preserve its argument that the tortious 
interference and fraud claims are time-barred. In its motion for 
directed verdict at trial, Exxon argued that all of the claims “are 
barred by the applicable statutes of limitations.” Exxon made the same argument 
before the court of appeals and raises the issue in this Court. Exxon preserved 
this issue for our review.

[8] Exxon 
asserts that the Miesches did not raise the second 
waste claim in the trial court. In this Court, the royalty owners seem to raise 
this second waste claim involving improper plugging methods used by Exxon to 
allegedly prevent future re-entry of production from the wells. It is arguable 
whether the Miesches raised this issue in the trial 
court as part of their claim for waste (Count 2). In Count 3 (Negligence Per Se) 
of the Miesches’ Fourth Amended Petition in 
Intervention, they alleged negligence and state that lost royalties from the 
additional cost of re-drilling improperly plugged wells was the basis of that 
claim. In Count 2 (Breach of Regulatory Law—Duty Not to Commit Waste) of this 
Petition, the Miesches complain of “underground waste 
or loss” resulting from “drilling, equipping, locating, spacing or operating a 
well or wells in a manner that reduces or tends to reduce the total ultimate 
recovery of oil or gas from any pool” (quoting Tex. Nat. Res. Code § 85.046). The Miesches only mention pumping contaminants into the wells in 
Count 2 (Waste), and specifically mention sabotaging, junking and pumping 
contaminants into the wells in Count 4 (Tortious 
Interference), Count 5 (Fraud) and Count 6 (Cost to Re-Enter). So it is arguable 
whether the Miesches raised the issue of sabotage in 
their claim for waste in Count 2, while they specifically complained of sabotage 
or intentional damage to wells in other counts of their pleading. For purposes 
of our analysis, we will assume the issue was raised in the trial court.
 

[9] The 
June 1994 report lists two other wells (B-4 and B-5), not included in this list, 
in which casing had been cut and pulled out of the hole, which Emerald and the 
Miesches state is the proper procedure.

[10] Exxon 
argues, citing administrative regulations, that cutting casing before plugging 
wells is not blanketly prohibited by the Railroad 
Commission’s rules. See 16 Tex. 
Admin. Code § 3.14 (d)(8) (R.R. Comm’n of Tex., 
Plugging). For purposes of this analysis, we assume the validity of Emerald’s 
and the royalty owners’ complaints that leaving cut casing in abandoned 
wellbores is improper.

[11] The 
royalty owners and Hite used “horizon,” “stratum,” and “zone” 
interchangeably.

[12] The 
jury also found that Exxon fraudulently concealed its breach and that the 
royalty owners did not know, and could not have known with due diligence, that 
Exxon fraudulently concealed its failure to fully develop until February 1999 
when Exxon produced previously requested documents during discovery. For the 
reasons that follow, we need not reach the royalty owners’ fraudulent 
concealment claim.

[13] The 
specific terms at issue are from the Lease, Plaintiffs’ Exhibit 1 at 
trial.

[14] 
Article 3(b) provides the same general obligation for the Second Tract 
and includes the same definition of “fully developed” for both oil and gas 
production, but in the Second Tract the duty requires “one (1) well,” rather 
than “at least one (1) well” be completed for oil as in the First Tract. The 
trial judge inquired whether the Lease language was ambiguous and was advised by 
the parties that it was unambiguous. They raise no distinctions in the 
obligations between the First and Second Tract in this Lease, or obligations 
regarding other tracts in the three remaining leases.
 

[15] The 
royalty owners set out the duty as: “The leases are fully developed only when 
‘at least one (1) well has been drilled and completed in each horizon or stratum 
capable of producing oil or sulphur for each twenty 
(20) acres of said tract.’” In the Lease, the phrase “in paying quantities” 
occurs after the word “sulphur.”

[16] On 
rehearing, an amicus curiae brief by Professor Jacqueline Weaver, of the 
University of Houston Law Center, argues that we should 
determine Exxon’s obligations by searching the entire oil and gas Lease. 
Certainly, the parties’ obligations to each other concerning oil and gas 
operations in the O’Connor Field are determined by all 43 articles in the 26 
pages of the Lease. However, on appeal, we address only those issues properly 
brought before us. The Miesches have not mentioned, 
much less argued, in this Court any articles in the Lease other than 3, 4 and 36 
prior to rehearing. They argue Articles 3 and 4 in a few sentences in their 
brief and mention Article 36 in a footnote. Rather than attempt to predict which 
arguments in a contract the parties should pursue, our analysis is limited to 
the issues they raise.

[17] We 
need not address this contention under Article 36 as surrendering the Lease does 
not relieve Exxon of its obligations under Article 3.

[18] 
Notwithstanding this testimony from their expert, the royalty owners 
argue that the “records reflected that Exxon had not produced from the only two 
wells completed in the H12 zone.”

[19] Amicus 
Professor Weaver also concludes that Article 4 is an express covenant that “is 
separate and apart from any development obligations in Article 3.”

[20] No 
party argues that the Lease is ambiguous. The trial judge inquired of the 
parties on more than one occasion whether the Lease terms were ambiguous. The 
parties maintained that they were not. However, in her amicus brief, Professor 
Weaver at least impliedly acknowledges that the provisions of Articles 3 and 4 
are not entirely consistent. Notwithstanding this, royalty owners contend the 
Court should give effect to the “full value” language in Article 4 but should 
not enforce the definition of “fully develop” in Article 3.

[21] 
Because we conclude no evidence supports the royalty owners’ breach of 
lease claim, we need not reach the issue of whether the claim is time-barred or 
whether the doctrine of fraudulent concealment tolls the statute of limitations. 
See Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 352 n.1 (Tex. 1990) 
(noting that the doctrine of fraudulent concealment estops a defendant who conceals the existence of a cause of 
action from asserting the statute of limitations as an affirmative 
defense).

[22] This 
opinion does not preclude the parties on remand from seeking to establish the 
date on which Emerald learned of the alleged misrepresentations.

[23] 
Emerald claims that it is entitled to damages that include profit on lost 
mineral production due to the alleged fraud. Because this issue was not 
presented to this Court, we need not address it. However, we note that the 
“measure of damages in a fraud case is the actual amount of the plaintiff’s loss 
that directly and proximately results from the defendant’s fraudulent conduct.” 
Tilton v. Marshall, 925 S.W.2d 672, 680 (Tex. 
1996).